

Frank W. Volk, Chief Judge
United States Bankruptcy Court
Southern District of West Virginia
12/1/17

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT CHARLESTON

| | |
|---|---|
| IN RE: | CASE NO. 3:17-bk-30092 |
| | *Joint Administration* |
| PASSAGE MIDLAND MEADOWS OPERATIONS, LLC, | |
| PASSAGE VILLAGE OF LAUREL RUN OPERATIONS, LLC, | CHAPTER 11 |
| PASSAGE LONGWOOD MANOR OPERATIONS, LLC, and | |
| PASSAGE HEALTHCARE PROPERTY, LLC, | JUDGE FRANK W. VOLK |
| | |
| Debtors-in-Possession. | A.P. NO. 3:17-ap-3010 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pending are (1) the Motion Filed by Creditor Welltower Inc. to Determine that the Automatic Stay Does Not Apply to Recovery of Possession or for Stay Relief ("stay relief motion") [Dckt. 73], (2) the Motion by Passage Healthcare Property, LLC, Passage Longwood Manor Operations, LLC, Passage Midland Meadows Operations, LLC, Passage Village of Laurel Run Operations, LLC, (collectively "Passage") for a Final Order Authorizing the (a) Use of Cash Collateral, and (b) Grant of Adequate Protection ("cash collateral motion") [Dckt. 6], (3) the Motion of PHSG, LLC, for Relief From Stay or, Alternatively, for Adequate Protection ("adequate protection motion") [Dckt. 126], and (4) Passage's Motion (in the adversary proceeding) to Extend the Automatic Stay Under 11 U.S.C. § 362(a) and for Preliminary Injunction Under 11 U.S.C. § 105, Adv. Pro. No. 17-03010 (Adv. Dckt. 2) (the "application for a preliminary injunction").[1]

---

[1] For reasons which will become apparent, the Court has held in abeyance its rulings on the cash collateral motion and the adequate protection motion to provide the parties an opportunity to consider the necessity, if any, for any further proceedings on those matters.

.         On April 26, 2017, the Court held a preliminary hearing on the stay relief

motion and the adequate protection motion. On May 23 and 24, 2017, the Court held a final

evidentiary hearing on the stay relief motion, the cash collateral motion and the application for a

preliminary injunction.

Based upon the admissible evidence received, the Court now enters its findings of

fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.

## I.

Passage leases and operates three healthcare facilities owned by Welltower. The

facilities are (1) Midland Meadows in West Virginia, (2) The Village of Laurel Run, and (3)

Longwood Manor, both of which are in Pennsylvania ("facilities"). The facilities provide assisted

living, skilled nursing, independent living and dementia care for over 400 residents.

On August 4, 2015, Welltower and Passage Healthcare Property, LLC ("Passage

Property"), entered into the Amended and Restated Master Lease ("Master Lease") that is central

to this dispute. In sum, Welltower leased the facilities to Passage Property, the tenant, which in

turn subleased them to the three affiliated subtenants, (1) Passage Midland Meadows Operations,

LLC, (2) Passage Village of Laurel Run Operations, LLC, and (3) Passage Longwood Manor

Operations, LLC. The Master Lease is representative of the customary leases found in the senior

living industry.

The four aforementioned Passage entities are owned by Passage Healthcare LLC

("Passage Healthcare"). The members of Passage Healthcare, a non-debtor, are Andrew Turner

and William F. Lasky. Passage Healthcare's sole business is its ownership of Passage and

managing the facilities pursuant to the subleases with the three Passage subtenants. Each of the

Passage subtenants is a guarantor of Passage Property's Master Lease obligations. The principals

of Passage are savvy and possessed of exceptional expertise in the senior care health industry. Mr.

Lasky has more than thirty years of experience. He previously operated over 500 senior-care

facilities nationwide and served as Chairman of the Assisted Living Federation of America. Mr.

Turner has more than forty-three years of experience, operating over 1,600 senior care facilities in

nine countries during his career. Throughout their negotiations with Welltower, which are detailed

within, Mr. Turner and Mr. Lasky were represented by well-qualified legal counsel.

Mr. Lasky identified Welltower as a real estate investment trust following a

pleasant twenty-year relationship with Welltower. For example, during the 1980s, a company

owned by Mr. Lasky had leases with Welltower. Welltower is a Delaware corporation

headquartered in Toledo, Ohio. HCRI Pennsylvania Properties Holding Company ("HCRI") is a

Delaware statutory trust. Welltower is the HCRI trustee, with its principal place of business in

Ohio. Joe Weisenburger, the Vice President of Business Development at Welltower, testified at

the evidentiary hearing and in certain declarations. He has served Welltower for two decades. Mr.

Weisenburger's written and oral testimony is deemed credible and consistent with other evidence

in the record. He provided prompt and thorough answers demonstrating both a depth of knowledge

of the course of dealing with Passage without so much as a hint of structuring or reaching. His

behavior on the stand was characteristic with one accurately recounting a series of material events.

At some point in 2015, Welltower learned the facilities were being marketed by a

broker on behalf of their former owner. Although Welltower and Passage later entered the Master

Lease as to these facilities, neither Mr. Lasky nor Mr. Turner were responsible for Welltower

learning of the purchase opportunity. Welltower was hesitant to pay the asking price for the

facilities. In the end, Welltower paid $66.5 million to acquire the facilities, along with the $2.7

million contingent payment amount used for subsequent renovations to the Laurel Run Facility, as set forth below:

| Date | Welltower Funding | Transaction |
|------|-------------------|-------------|
| 07/10/2015 | $49,180,000 | Pennsylvania acquisitions. |
| 08/04/2015 | 17,320,000 | West Virginia acquisition. |
| 09/04/2015 to 07/01/2016 | 2,700,000 | Laurel Run capital improvements. |

**$69,200,000   TOTAL**

Mr. Lasky testified that he, Mr. Turner and Passage "paid almost $5.7 million toward the purchase of three Senior Care Facilities." That contention finds scant support in the record when the particular elements of that alleged contribution are analyzed. Those components are (1) seller notes ($4.195 million), (2) transaction costs and legal fees ($692,000 and $330,000 respectively), and transfer taxes ($470,000).

First, the $4.195 million in seller notes were issued to the sellers either by the non-debtor Passage Healthcare and guaranteed by Mr. Lasky and Mr. Turner or, alternatively, by those two gentlemen individually. In either eventuality, the contribution was made of their own volition, without encouragement from Welltower, and designed to nudge Welltower to accomplish the acquisition. Second, the combined $1,022,000 transaction costs and legal fees were, in actuality, paid at closing by Welltower. Third, the $470,000 in transfer taxes were paid by the seller, a somewhat unusual but apparent outcome. Indeed, Salvador Ramos, Passage Healthcare's Chief Financial Officer, was unable to identify a transfer tax payment. Thus, all acquisition costs and related transaction expenses were funded by Welltower, other than the amounts financed through certain seller notes. All amounts paid, if any, under the seller notes originated from Passage funds, without personal contribution by either Mr. Lasky or Mr. Turner. It is further the case that the improvement costs for the Laurel Run renovations were paid entirely by Welltower.

4

The next set of findings deals with the events of default under the Master Lease. These events of default consist of the following: (1) failing to pay rent according to the terms of the Master Lease since August 2015, (2) breaching every financial covenant under the Master Lease since August 2015, (3) accomplishing impermissible distributions and payments to affiliates and insiders during the events of default, beginning in 2015, continuing throughout the Master Lease, and post-petition, (4) defaulting under the PHSG loan, a default on a "Material Obligation" under the Master Lease; (5) failing to provide required financial reports and certifications under Section 15.3 of the Master Lease since 2015 and continuing post-petition, (6) failing to provide requested information in connection with the necessary transition of operations, and (7) failing to provide a replacement letter of credit. These events of default are more fully described in Welltower's Proposed Findings of Fact and Conclusions of Law, which description the Court adopts herein.

The next set of findings involves Welltower's termination of the Master Lease following the largely undisputed events of default. In June 2016, Welltower entered into a Forbearance Agreement with Passage ("Forbearance Agreement") following Passage's many breaches. In the Forbearance Agreement, Passage acknowledged the events of default, including (1) the failure to pay rent and (2) the disregard of the financial covenants. Passage admitted these events of default authorized Welltower to terminate the Master Lease or exercise its additional remedies thereunder. The Forbearance Agreement relieved Passage from certain payment and covenant obligations, thus providing Passage an opportunity to demonstrate going forward its ability to comply with the Master Lease obligations, avoid default, and a Master Lease termination by Welltower. Passage soon breached its payment obligations, however, and committed a "Forbearance Default." This resulted in Welltower being immediately vested with the right to terminate the Master Lease. Despite this authorization, and without waiving its remedies,

Welltower again provided Passage the opportunity to comply. In sum, the Forbearance Agreement expired on October 1, 2016, and Welltower explored with Passage the possibility of remediating the repeated rent shortfalls and other financial defaults.

On January 11, 2017, Welltower met with Mr. Lasky in Ohio to discuss defaults. Mr. Lasky acknowledged Passage needed additional capital contributions, but told Welltower Mr. Turner would not make such a contribution and disallowed Mr. Lasky from doing so to avoid dilution of the former's ownership stake. Mr. Lasky also acknowledged that the management office in Puerto Rico used by Passage was an unjustifiable expense maintained to confer a special tax benefit on Mr. Turner. In response, Welltower warned Mr. Lasky a formal default notice would be forthcoming if Passage did not bring rent current by the end of January 2017. Passage did not come current and the other events of default continued.

On January 31, 2017, Welltower sent Passage the default notice. At that time, the unpaid rent was $2,356,789.27. Mr. Lasky acknowledged he was not surprised to receive the Default Notice. On February 7, 2017, Welltower held a conference call with Mr. Lasky and Mr. Turner. Welltower asked for a proposal on bringing the rent current. Mr. Turner proposed that Welltower draw on the letter of credit issued under the Master Lease. Although Welltower eventually drew down the letter of credit, which was its right under the Master Lease[2], it advised Mr. Turner at this earlier time that his proposed solution was unacceptable inasmuch as (1) it did not address Passage's underlying financial distress, and (2) it was inconsistent with the terms of the Master Lease. Mr. Turner hung up the phone.

---

[2] The letter of credit draw was a remedy which Welltower was entitled to avail itself of upon an event of default. It was not a cure for events of default such as nonpayment of rent. .

On February 15, 2017, PHSG issued its second default notice to Passage. On February 27, 2017, Welltower sent Passage a termination notice of the Master Lease and accelerated the rent due in accordance with Section 8.2(e). The termination notice stated that, inter alia, "[p]ursuant to Section 8.2(b) of the Lease, Landlord hereby terminates the Lease as of the date of this letter." Passage's events of default were substantial, continuous, and resulted in multiple breaches of the fundamental obligations under the Master Lease. Welltower, however, acted reasonably and in good faith during the term of the Master Lease, resorting to termination only as an absolute last resort. Welltower acted in accordance with the Master Lease and applicable law, and did so reasonably.

On February 27, 2017, Welltower brought an action in the United States District Court for the Northern District of Ohio seeking the appointment of a receiver for Passage's businesses. Passage sought the immediate appointment of Paramount Health Holdings Group, Inc. as receiver.

On March 13, 2017, Passage Midland Meadows Operations, LLC, Passage Healthcare Property, LLC, Passage Village of Laurel Run Operations, LLC, and Passage Longwood Manor, LLC, voluntarily petitioned for relief under Chapter 11 of the Bankruptcy Code. On March 17, 2017, Welltower instituted an action against Mr. Turner and Mr. Lasky in the United States District Court for the Northern District of Ohio, seeking an amount exceeding $69,000,000, plus attorney's fees, costs and prejudgment and post-judgment interest. On March 28, 2017, Welltower and HCRI  filed the stay relief motion.

## II.

The Court is vested with jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) & (G). Venue is proper pursuant to 28 U.S.C. § 1409. The analysis proceeds in three parts. First, the Court analyzes which sovereign's law controls whether the Master Lease was terminated. Second, the Court addresses whether the Master Lease was lawfully terminated according to the chosen law. Third, the Court will ascertain whether the Master Lease is a "nonresidential lease" under the affected sections of the Bankruptcy Code.

### A.     Choice of Law

While there is a divide in the circuits on the question, our court of appeals' approach is clear respecting the choice-of-law rules applicable here:

> The determination of property rights in the assets of a bankrupt's estate is generally a matter of state law. *Butner v. United States*, 440 U.S. 48, 54, 99 S. Ct. 914, 917–18, 59 L.Ed.2d 136 (1979). . . .
> . . . .
>
> A uniform rule under which federal bankruptcy courts apply their forum states' choice of law principles will enhance predictability in an area where predictability is critical. . . . It would be anomalous to have the same property interest governed by the laws of one state in federal diversity proceedings and by the laws of another state where a federal court is sitting in bankruptcy. Because no overwhelming federal policy requires us to formulate a choice of law rule as a matter of independent federal judgment, we adopt the choice of law rule of the forum state, South Carolina.

*In re Merritt Dredging Co., Inc.*, 839 F.2d 203, 205–06 (4th Cir. 1988).

The West Virginia choice-of-law rule applicable here is equally well-settled. Our State exhibits a strong preference for holding sophisticated contracting parties to the wishes

expressed in their written accord:

> Stated another way, "[t]his Court has recognized the presumptive validity of a choice of law provision, (1) unless the provision bears no substantial relationship to the chosen jurisdiction or (2) the application of the laws of the chosen jurisdiction would offend the public policy of this State." *Manville Pers. Injury Settlement Tr. v. Blankenship*, 231 W.Va. 637, 644, 749 S.E.2d 329, 336 (2013) (citing *Bryan v. Massachusetts Mut. Life Ins. Co.*, 178 W.Va. 773, 777, 364 S.E.2d 786, 790 (1987); Syl. pt. 1, *General Elec. Co. v. Keyser*, 166 W.Va. 456, 275 S.E.2d 289 (1981)).

*West Virginia CVS Pharmacy, LLC v. McDowell Pharmacy, Inc.*, 796 S.E.2d 574, 580, 238 W. Va. 465, 471 (2017). *Cf. generally* J. Zak Ritchie, *A Tie That Binds: Forum Selection Clause Enforceability in West Virginia*, 113 W. Va. L. Rev. 95 (2010).

       The parties chose the law to govern their responsibilities to one another. That choice is reflected in Section 24.6 of the Master Lease:

> 24.6 Governing Law. This Lease shall be governed by and construed in accordance with the laws of the State of Ohio, except as to matters under which the laws of a State in which a respective Facility is located, or under applicable procedural conflicts of laws rules, require the application of laws of such other State, in which case the laws or conflicts of laws rules, as the case may be, of such State shall govern to the extent required.

(*Id.*)

       Despite Passage's contrary reading, there is no room for doubt. The Master Lease is subject to Ohio law alone. The proviso found in the second portion of Section 24.6 does not change that result. West Virginia would not "require the application of" its laws here under *McDowell Pharmacy*. First, the provision bears a substantial relationship to the chosen jurisdiction. Binding precedent teaches that relationship is supplied by one of the contracting parties planting its flag in the designated jurisdiction. *Shaw v. Dawson Geophysical Co.*, 657 F. Supp. 2d 740, 746 (S.D. W. Va. 2009) ("The . . . [governing agreements] bear a substantial relationship to Wyoming inasmuch as Trans Aero, the drafter of the . . . [governing agreements], is a Wyoming corporation with a principal place of business in Cheyenne, Wyoming."); *Cavcon, Inc. v. Endress ± Hauser,*

*Inc.*, 557 F. Supp. 2d 706, 719–20 (S.D. W. Va. 2008) (choice of law provision upheld inasmuch as "Indiana is the physical location of defendant Endress and is the state in which Endress is incorporated."). Inasmuch as Welltower's headquarters and principal place of business are in Ohio, Section 24.6, and the Master Lease generally, bear a substantial relationship to that Sovereign's laws.

Second, neither Section 24.6 nor the Master Lease offend West Virginia public policy. The parties' negotiation of the Master Lease, the termination procedure found therein, and the substance that gives rise to the termination procedure are all unremarkable in a commercial setting and were not enforced in a high-handed or suspect manner. Just the opposite is true, as more fully discussed in the next part.

Accordingly, Ohio law governs the Master Lease, including Welltower's right of termination.

## B.    Master Lease Termination

As noted, the January 31, 2017, default notice advised Passage of Welltower's intention to "exercise any and all remedies available to it under the [Master] Lease, and at law and/or in equity, including but not limited to, drawing on the Letter of Credit and/or terminating the Lease." Faced with that ominous notice, Passage undertook no substantial efforts to cure. A valid Master Lease termination followed on February 27, 2017. The events of default set forth above gave rise to termination pursuant to Section 8.2(b) of the Master Lease, which provides that "[u]pon the occurrence of an Event of Default . . . and at any time thereafter . . . Landlord may exercise any and all rights and remedies provided in this Lease . . . including, without limitation . . . Landlord may terminate this Lease by written notice to Tenant." That is precisely what occurred.

10

Simply put, Welltower, under Ohio law and the common law generally, lawfully exercised its right

of termination under the Master Lease pre-petition.

Passage offers several contentions designed to avoid that result. First, it contends

that equity should intervene to enjoin termination. Assuming equity played any role in the calculus

given the remarkable progression of events and the unambiguous Master Lease provisions here

involved[3], the substantial and continuous -- not to mention undisputed -- Master Lease breaches

in this case abundantly demonstrate the scales of justice tip overwhelmingly toward Welltower.

In sum, Mr. Lasky testified that Welltower was "a very good partner." He had solid

footing for that observation. Welltower (1) refrained from formally declaring a default over a 19-

month period, (2) persistently raised Passage's rent shortfalls, non-compliance with financial

covenants and other breaches of the Master Lease, (3) met with Passage representatives "every

month . . . and discussed all issues relating to the Debtors' operations . . . [;]" (4) agreed -- in an

astonishing act of grace -- to waive Passage's financial covenant defaults for the relevant period

in 2015 so that Passage's auditors could issue a clean report, (5) granted an additional waiver of

existing events of default in order to permit Passage to increase the amount of the PHSG term loan

---

[3] Ohio does not permit equity to trump the clearly expressed terms of a lease. *See, e.g.,
Fifth Third Bank W. Ohio v. Carroll Bldg. Co.*, 905 N.E.2d 1284, 1287 (Ohio Ct. App. 2009)
("[w]hen construing and interpreting lease provisions, courts have applied traditional contract
principles and have enforced a lease as written if its language is clear and unambiguous . . . . Cases
of contractual interpretation should not be decided on the basis of what is just and equitable . . .
."); *Ahmed v. Scott*, 418 N.E.2d 406, 411 (Ohio Ct. App. 1979) ("[e]quity will not relieve a lessee
of the consequences of his failure to give written notice of renewal of the lease within the time
required by provisions of the lease . . . ."); *Sims v. Anderson*, 38 N.E. 3d 1123, 1128-29 (Ohio Ct.
App. 2015) ("the trial court should not have weighed equitable considerations to determine if
forfeiture is the appropriate remedy because under the express terms of the lease the parties
contractually agreed that it is"). The law could not be clearer on the point. *See Ervin v. Garner*,
267 N.E.2d 769, 774 (Ohio 1971) ("Cases of contractual interpretation should not be decided on
the basis of what is 'just' or equitable. This concept is applicable even where a party has made a
bad bargain, contracted away all his rights, and has been left in the position of doing the work
while another may benefit from the work").

from $2.5 million to $3.5 million in February 2016, and (6) entered the forbearance agreement

that, *inter alia*, extended rent payment dates and waived the financial covenants for July, August

and September 2016. These are not the acts of a predator waiting to deliver a financial death blow.

Despite its best efforts to aid, coax, warn, and even threaten Passage of the coming consequences

of its repeated breaches, no meaningful remedial efforts were taken by the lessee or sublessees.[4]

Passage next contends the Master Lease should be deemed unconscionable under

Ohio law. But neither Ohio nor any other common-law jurisdiction would so hold. Using the

familiar gateways of substantive and procedural unconscionability, it would be incumbent upon

Passage to demonstrate "(1) unfair and unreasonable contract terms, *i.e.*, 'substantive

unconscionability,' *and* (2) individualized circumstances surrounding each of the parties to a

contract such that no voluntary meeting of the minds was possible, *i.e.*, 'procedural

---

[4] Passage also resorts to equity in asserting that termination will result in Mr. Lasky and Mr. Turner forfeiting the money they invested to purchase and renovate certain facilities. This contention fails for at least two reasons. First, the record does not support the alleged "investment" or "contribution." The Court has carefully re-examined the relevant testimony of both Mr. Lasky and Salvador Ramos, Passage's Chief Financial Officer. The former is a knotted riddle of speculation and imprecision, substantially discrediting his testimony in the process. The latter is a conservative assessment which falls far short of supporting the scope of Mr. Lasky, Mr. Turner, or Passage's role in the acquisitions. The Court is left in this near-vacuum with its finding that all acquisition costs were paid by Welltower or financed by the sellers through notes that were repaid with Passage funds. That finding also decimates Passage's contention that the Master Lease is not a true lease but rather an investment vehicle. There is no basis for drawing that inference.

But assuming the evidence might be interpreted differently as giving rise to the desired investment inference, it would press the limits of reason. Passage is run by some of the most sophisticated players in the industry. And they were aided by skilled legal counsel. It is inconceivable that these two practiced professionals would devote millions of dollars in cash or debt without insisting it be reflected and accounted for in some investment agreement or the Master Lease. Indeed, they refer to their putative monetary infusions in their adversary complaint as "no-strings-attached contribution[s]." (A.P. Compl. ¶ 41).

Assuming there was a sufficient evidentiary basis to conclude the investments were made, and that some remedy was in order, the Court would be required to freehand it. While contract enforcement, interpretation, construction and the like are customarily found in the judicial quiver, it would far exceed the undersigned's warrant to so rewrite the parties' reticulate and comprehensive bargain.

unconscionability[.]'" *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 365 (6th Cir. 2014) (emphasis added); *see also In re Tillette*, 557 B.R. 902, 907 (Bankr. S.D. W. Va., 2016) ("As recently reiterated by the Supreme Court of Appeals of West Virginia, 'Under West Virginia law, we analyze unconscionability in terms of two component parts: procedural unconscionability and substantive unconscionability.' In West Virginia, '[t]he doctrine of unconscionability means that, because of an overall and gross imbalance, one-sidedness or lop-sidedness in a contract, a court may be justified in refusing to enforce the contract as written.'" (quoting *Nationstar Mortgage, LLC v. West*, 237 W. Va. 84, 88, 785 S.E.2d 634, 638 (2016) (internal quotation marks and cited authority omitted) and *Brown v. Genesis Healthcare Corp.*, 229 W.Va. 382, 391, 729 S.E.2d 217, 226 (2012)); *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 119, 592 Pa. 323, 331 (2007) (applying a similar formulation). As noted, Mr. Lasky and Mr. Turner (1) are sophisticated, (2) possess decades of experience in the healthcare industry, and (3) enjoyed representation by skilled legal counsel. They simply cannot make the wicket on procedural unconscionability. Further, the duty to pay rent, to furnish documents attesting to Passage's continued financial health, and to avoid a default on a material obligation of the Master Lease -- all of which occurred here in superabundance -- would all be expected in a lease of this type and warrant a contractual remedy for material breach.[5]

---

[5] Passage has asserted that "[a]ll Turner and Lasky received from the[ir putative] investment was the Master Lease, which Welltower now seeks to terminate." (Mot. for Prelim. Injunc. ¶ 5). If this is the limit of the consideration the two gentleman claim supports their putative multimillion dollar investment, they received the benefit of their bargain. They obtained Welltower's exchanged promises under the Master Lease. The fact that their controlled entities later breached that Master Lease, resulting in the seismic repercussions about which they now complain, is not a consequence of overreaching or overbearing by Welltower. It is simply the case they struck a bad bargain and their forecast respecting the outcome of their venture was unduly optimistic. Welltower is not properly chargeable with either unfortunate outcome.

Third, Passage asserts that the Master Lease's termination provisions constitute a prohibited "dragnet" forfeiture clause under West Virginia law, thus presumably resulting in a violation of public policy that might change the choice-of-law analysis. It is true, as Passage contends, that the law does not favor forfeiture. *See McKenzie v. Cherry River Coal & Coke Co.*, 466 S.E.2d 810, 818, 195 W.Va. 742, 750 (1995); *Easley Coal Co. v. Brush Creek Coal Co.*, 91 W.Va. 291, 296, 112 S.E. 512, 514 (1922). The circumstances here, however, do not give rise to the wholesale forfeiture concerns expressed in West Virginia law. Foremost, the termination here was not a technical one that unexpectedly brought down the Passage "house of cards." It was instead based upon specific, deliberate, and serious defaults that were (1) long occurring, (2) spelled out in the default notice, and (3) reiterated in a termination letter. It comes as no surprise then that they would be expected to give rise to the precise actions taken by Welltower. In sum, this was a sufficiently detailed and progressive default under West Virginia law and certainly not so suspect that it would amount to a violation of public policy to the point of eviscerating the parties' mutual choice-of-law bargain.

The Master Lease was lawfully terminated in accordance with law and its negotiated terms.

## C.    Characterization of the Master Lease

It is difficult to imagine any lawyer or layperson describing the Master Lease as residential in nature rather than "nonresidential" or commercial. When one thinks of a residential lease what commonly comes to mind is the agreement that arises from one individual renting a home or apartment from another.

But Passage contends the Master Lease is residential. The reason is that such a finding would substantially aid its quest for reorganization. A brief examination of certain key sections of the Bankruptcy Code discloses why that is the case. First, 11 U.S.C. § 365, the statute covering executory contracts and unexpired leases states as follows:

> (c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if--
>
> . . . .
>
> (3) such lease is of *nonresidential real property* and has been terminated under applicable nonbankruptcy law prior to the order for relief.

. . . .

> (d)(4)(A) Subject to subparagraph (B), an unexpired lease of *nonresidential real property* under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that *nonresidential real property* to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of . . . [certain stated intervals unless extended by the court].

11 U.S.C. § 365(c)(3) and (d)(4)(A) (emphasis added). Also relevant is a portion of 11 U.S.C. § 541(b), namely, subsection (b)(2):

> (b) Property of the estate does not include--
>
> . . . .
>
> (2) any interest of the debtor as a lessee under a lease of *nonresidential real property* that has terminated at the expiration of the stated term of such lease before the commencement of the case under this title . . . .

11 U.S.C. § 541(b)(2) (emphasis added). Finally, that portion of the Bankruptcy Code covering the automatic stay provides pertinently as follows in subsection 362(b)(10):

> (b) The filing of a petition under section 301 . . . does not operate as a stay--
>
> . . . .
>
> (10) . . . of any act by a lessor to the debtor under a lease of *nonresidential*

15

*real property* that has terminated by the expiration of the stated term of the lease before the commencement of . . . a case under this title to obtain possession of such property . . . .

11 U.S.C. § 362(b)(10) (emphasis added).[6]

In sum, if the Master Lease is deemed "nonresidential" in nature, contrary to Passage's desire, (1) it is not estate property, (2) it may not be assumed, and (3) Welltower's hoped-for lease transition to Paramount would not transgress the automatic stay. The analysis is complicated by two considerations, namely, that (1) the Bankruptcy Code does not define the term "nonresidential[,]" and (2) a split of authority exists, with the majority taking an unexpected approach.

Two tests have emerged. The majority approach examines the nature of the property leased, and a minority position assesses instead the nature of the lease. *See*, *e.g.*, Hon. Michael B. Kaplan, Hon. Stacey L. Meisel & Michael D. Sousa, *Consumer Bankruptcy Manual* § 4:106 (2d ed. 2017 Supp.) ("In determining whether the demised premises are residential or not, courts have adopted a variety of tests. Some courts examine the nature of the property, including, for example, whether people reside on the property. Other courts examine the nature of the lease, including, for example, whether the debtor derives income therefrom."); Joshua Fruchter, *To Bind or Not to Bind -- Bankruptcy Code § 365(D)(3): Statutory Minefield*, 68 Am. Bankr. L.J. 437, 441 (1990) (same).

---

[6] Passage appears to contend that use of the word "expiration" does not include the pre-expiration Master Lease termination that here occurred. The Court disagrees. *See*, *e.g.*, *In re Policy Realty Corp.*, 242 B.R. 121, 128 (S.D.N.Y. 1999), *aff'd*, 213 F.3d 626 (2d Cir. 2000); *In re Southcoast Express, Inc.*, 337 B.R. 739, 742–43 (Bankr. D. Mass. 2006); Doug Uloth, *Pre-Petition Termination of Executory Contract as Fraudulent Transfer*, 32 Am. Bankr. Inst. J. 28, 28 (2013) ("Section 541(b)(2) applies not only to a nonresidential lease's expiration, but also to a lease terminated under its default provisions.") (citing cases).

As noted, the nature-of-the-property test ("property test") focuses on whether people reside at the leased location. *See In re Care Givers, Inc.*, 113 B.R. 263 (Bankr. N.D. Tex. 1989) (concluding that although a nursing home had both a residential and nonresidential aspect, it was still considered residential); *In re Independence Village, Inc.*, 52 B.R. 715 (Bankr. E.D. Mich. 1985) (concluding that a life-care facility for senior citizens was residential because people lived on the property); *Matter of Terrace Apts. Ltd.*, 107 B.R. 382 (Bank. N.D. Ga. 1989) (concluding that nature of the property is the key factor in determining whether a property is residential); *In re Texas Health Enters., Inc.*, 255 B.R. 181 (Bankr. E.D. Tex. 2000) (concluding that nursing home leases were residential leases); *Alegree v. Michael H. Clement Corp.* (*In re Michael H. Clement Corp.*), 446 B.R. 394 (N.D. Cal. 2011) (applying nature of the property test, which the court believed was the majority view, to determine that property was residential).

The nature-of-the-lease test focuses instead on whether the intent of the lease is to provide income for the commercial lessee ("income test"). *See In re Sonora Convalescent Hosp., Inc.*, 69 B.R. 134 (Bankr. E.D. Cal. 1986) (noting the commercial intent of the lease is used to determine that property was nonresidential even though patients resided on the property); *In re Clinton Care Ctr., LLC*, 436 B.R. 390 (Bankr. N.D. Miss. 2010) (concluding that § 365(d)(3) applies to nursing home leases); *In re Emory Properties, Ltd.*, 106 B.R. 318 (Bankr. N.D. Ga. 1989) (concluding that a hotel lease was nonresidential based on commercial purpose and common meaning of the term "residential" even though it had permanent residents); *In re Condo. Admin. Servs., Inc.*, 55 B.R. 792 (Bankr. M.D. Fla. 1985) (concluding a mobile home park lease was nonresidential based on the nature of the lease and not on the use of the property as a residence).

Several reasons underlie the position taken by the courts applying the property test. Foremost, they often rely upon the structure of the statutory language, suggesting "Congress was

concerned with the type of property involved . . . . [I]n section 365(d)(4) itself the modifier 'nonresidential' directly qualifies the term 'real property'. Purely as a matter of grammatical construction, therefore, 'nonresidential' refers to the nature of the property and not the type of lease." *In re Lippman*, 122 B.R. 206, 210 (Bankr. S.D.N.Y. 1990). That observation is unquestionably correct. But a difficulty arises from hanging the entirety of the statutory analysis on those three words. Doing so tends to isolate one portion of the statute from its balance. The property test analysis thus risks contravening a time-honored principle of statutory construction, namely, that a reviewing court must give meaning and effect to every word of the statute.

Indeed, as noted by Judge Wynn in a recent opinion from our court of appeals, the canon is not easily set aside. *See, e.g.*, *Carroll v. Logan*, 735 F.3d 147, 152 (4th Cir. 2013) ("Unquestionably, we agree that courts should give effect to every word of a statute whenever possible. And doing so here requires us to reject the Carrolls' argument.") (citing *Broughman v. Carver*, 624 F.3d 670, 677 (4th Cir. 2010)). The Supreme Court recently reiterated the same point. *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) ("In essence, the employees ask us to treat those words as stray marks on a page -- notations that Congress regrettably made but did not really intend. Our practice, however, is to 'give effect, if possible, to every clause and word of a statute.'") (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (internal quotation marks omitted)).

If one broadens the analysis from the three words emphasized by the property test, it may help surface an entirely different statutory meaning. The starting point for that effort is to examine the relevant provisions for any other material words or phrases. That effort is undertaken below, with broken-underscored statutory language marked in addition to the emphasized nonresidential property phrase:

18

Section 365(c)(3): "The trustee may not assume . . . any . . . unexpired <u>lease of the</u> <u>debtor</u>. . . if . . . such lease is of *nonresidential real property* and has been terminated under applicable nonbankruptcy law prior to the order for relief.

Section 365(d)(4)(A): "Subject to subparagraph (B), an unexpired lease of *nonresidential real property* under which <u>the debtor is the lessee</u> shall be deemed rejected . . . ."

Section 541(b)(2): "(b) Property of the estate does not include . . . <u>any interest of</u> <u>the debtor as a lessee</u> under a lease of *nonresidential real property* that has terminated at the expiration of the stated term of such lease before the commencement of the case . . ."

Section 362()(10): "The filing of a petition . . . does not operate as a stay . . . <u>by a</u> <u>lessor to the debtor</u> under a lease of *nonresidential real property* that has terminated by the expiration of the stated term of the lease before the commencement of . . . a case . . . to obtain possession of such property. . . ."

The broken-underscored language, with its focus on the (1) "lease of the debtor" (365(c)(3)), (2) the debtor as "lessee" (365(d)(4)(A)), (3) the "interest of the debtor" under the lease ((541(b)(2)), and (4) the lease "by . . . lessor to the debtor" (362(b)(10)) indicate together that one cannot so easily dispense with the actual *use* to which the debtor will put the demised premises personally while still giving effect to the entirety of the language used in the statutory provisions. The substance of the lease, namely the precise purpose the lessee has for the property, must find its way into the analysis.

And therein lies the difficulty with the property test. All would appear to agree in the cases applying the property test that the debtor lessees in question never had any intention of making the leased premises his, her or, its residence. And yet that salient fact is sidelined by the property test analysis in favor of focusing, instead, and in isolation, on the use to which unnamed, unknown nondebtor sublessees, perhaps far down the leasing chain, will put the property. And that remote use (*e.g.*, living in a dwelling) will not be the same use (*e.g.*, investment and income production) that the original leasing parties contemplated. Instead, under the property test analysis

the lease that drives the analysis, if any, is not the one before the Court. It is instead some other

instrument, if any, perhaps between strangers to the original subject lease that were not at all

contemplated by the relevant statutory provisions.

A brief example illustrates the point. Under the property test, whether with (1) a

leased apartment building subleased to dwellers, (2) the leased land upon which a manufactured

housing community sits and where sublessees have moved their homes, or (3) a senior living center

under an arrangement like that between Welltower and Passage, none of the "residents" whose

tenancies will control the outcome of the residential/nonresidential analysis under the majority

approach will actually have a lease with the ultimate lessor, such as Welltower here. That approach

focuses on the nature of the property to be sure but, again, it entirely ignores the nature of the use

intended by the debtor, namely, investment and income production as opposed to setting up house.

In so doing, the property test does not give effect to the entirety of the statutory

provisions set out above, namely the debtor-focused provisions, and, in the process, runs contrary

to the aforementioned, long-settled canon of construction.

Additionally, the property test will inevitably lead to unnecessary complexities and

unintended results. Regarding the former, one commentator has observed as follows:

> The approach . . . of looking to the character of the property as opposed to that of
> the lease seems to offer less guidance in close cases, for example a residential
> apartment building which also has a number of commercial businesses or offices in
> the building. Opinions addressing such mixed character properties have drawn
> inconsistent conclusions. Looking to the character of the property in such mixed
> cases seems undeterminative as it is both residential and commercial in nature. One
> bankruptcy scholar has suggested that this sort of problem could be resolved by
> using some theory of "dominant use" but did not elaborate on how such dominant
> use would be measured. Either looking to the character of the property or its
> dominant use is arguably undesirable in that both approaches leave lessors and
> lessees without any clear guide regarding whether a lease in a mixed situation is
> residential or nonresidential prior to a specific court determination and thus with no
> means of knowing their specific rights and obligations under section 365.
> Alternatively, the method of looking to the character of the lease and the intent of

> the parties, . . . seems to provide better guidance for all parties, including the court, in a close situation. In the apartment building example, under this approach, the owner's lease to the management company would be nonresidential or commercial as would the management company's lease of space to commercial businesses in the building. The management company's lease with tenants who live in the building would be considered residential.

Jeffrey S. Battershall, *Commercial Leases and Section 365 of the Bankruptcy Code*, 64 Am. Bankr. L.J. 329, 341 (1990). Given the paramount role that informal discussion plays in pre- and post-insolvency negotiations, which might obviate the need for court involvement and a consequential reduction in time and expense, the bright lines occasioned by the income test are most desirable to say the least.

The property test also is far more likely to give way to unintended results. In the situation at hand dealing with senior living centers, many of Passage Property's sub-sub-lessee patients may have no intention whatsoever of becoming "residents" of a particular Passage facility. They may instead be there on a strictly transient basis, requiring assisted living services only for a brief time, more akin to an extended stay hotel. And yet they are treated by the property test as having essentially the same tenancy or interest under the Code as one whose mobile home is affixed to the realty in a manufactured housing community. It is unlikely Congress intended the Court to suspend its knowledge of the realities of a situation and its common sense in order to reach what could be, in some cases, a strained "residential" result. Nor is it likely that Congress intended, in analogous situations, the possibility of an expensive and extended evidentiary inquiry to determine whether what looked like a residential property or tenancy on the surface was, in actuality on closer inspection, a mixed residential and nonresidential facility or one more properly characterized as nonresidential alone.

There are two other considerations worth mentioning. Those courts applying the property test at times make mention of legislative history, patient or tenant protection, or both, to

21

support their outcomes. As one relatively recent commentator has noted, "[O]ne of the most intense jurisprudential debates in modern American law is about the use of legislative history in statutory interpretation and analysis." Mark Deforrest, *Taming A Dragon: Legislative History in Legal Analysis*, 39 U. Dayton L. Rev. 37, 38 (2013).  Several of the decisions applying the property test, however, came prior to the decreasing use of legislative history in the interpretive process. *See* Michael H. Koby, *The Supreme Court's Declining Reliance on Legislative History: The Impact of Justice Scalia's Critique*, 36 Harv. J. Legis. 369, 369 (1999) ("With the appointment of Justice Antonin Scalia in 1987, the United States Supreme Court had its first active opponent of using legislative history in statutory interpretation. Prior to his appointment, the Court had increasingly relied upon legislative history in its opinions. More than a decade after Justice Scalia's arrival on the Court, it is now useful to assess whether or not he has had any impact. As this Article will show, Justice Scalia and the critique he represents contributed significantly to a sharp reduction in the Court's use of legislative history."). Assuming resort to legislative history was appropriate, however, at least one bankruptcy court applying the property test has candidly observed that "[t]he legislative history for the . . . [affected Bankruptcy Code] sections manifests no real recognition of the problem before us." *In re Lippman*, 122 B.R. 206, 213 (Bankr.S.D.N.Y. 1990).

Regarding patient or tenant protection, the concerns of sublessee mass evictions arising from sublessor defaults seem slight. With the advent of increasing regulation, especially in the healthcare industry, not to mention risk management concerns ever-present in the mind of ultimate lessors, the more likely result is that the ultimate lessor will voluntarily, or by court order, stay his or her hand to allow for an orderly transition from the lessee, much as Welltower has attempted to do here. Further, it is difficult to imagine that a dependable source of recurring monthly revenue from a sub-sub-lessee base will be sacrificed by the ultimate lessor as a result of

his or her lease termination with the lessee. The ultimate lessor will more likely endeavor in the

mine run of cases to preserve that income stream without disruption and, perhaps, even cover the

matter preemptively in the lease during the negotiation process.

In sum, the Court concludes that the Master Lease is nonresidential in nature. Based

upon the Court's earlier conclusion that the Master Lease was effectively terminated prepetition,

(1) the Master Lease is not property of the estate, and (2) the automatic stay does not prevent

Welltower from obtaining possession of the leased properties.

Accordingly, there is no insolvency-related bar to continuation of the receivership

proceeding by Welltower in service of its as-yet unadjudicated rights to recover possession of the

facilities and transition to a new lessee. Based upon the foregoing, it is **ORDERED** as follows:

1.   That the Motion Filed by Creditor Welltower Inc. to Determine that the
     Automatic Stay Does Not Apply to Recovery of Possession or for Stay
     Relief [Dckt. 73] be, and hereby is, **GRANTED** to the extent set forth
     herein; and

2.   That, in view of the rulings heretofore, Passage's Motion (in the adversary
     proceeding) to Extend the Automatic Stay Under 11 U.S.C. § 362(a) and
     for Preliminary Injunction Under 11 U.S.C. § 105 [Adv. Dckt. 2] be, and
     hereby is, **DENIED.**